UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

State of Minnesota, City of Minneapolis, and City of Saint Paul

Defendants.

Case No. 26-cv-04123 (KMM/DLM)

**MEMORANDUM IN SUPPORT OF DEFENDANTS CITY OF MINNEAPOLIS' AND CITY OF SAINT PAUL'S JOINT MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

## INTRODUCTION

The United States proposes to drastically expand the reach of 34 U.S.C. § 12601 ("Section 12601") from both its textual limitations and intended purpose—addressing "patterns and practices" of police misconduct—to allowing the federal government to make facial challenges to whatever state statutes the Attorney General believes might conceivably be unconstitutional. In this instance, the United States is choosing to attack Minnesota's firearm-purchase permitting statutes, Minn. Stat. §§ 624.7131 and 624.7132 (respectively, "Section 624.7131" and "Section 624.7132") (collectively, "the Minnesota Statutes"), which require Minnesota residents who seek to purchase certain kinds of firearms to first clear a background check. Notwithstanding that Section 624.7131 entails no waiting period, and that in practice *no resident of either Minneapolis or St. Paul* has been subjected to any waiting period under Section 624.7132 (or, indeed, has invoked the process provided by that statute at all) in

at least the last three years, the United States claims that the statutes have an unconstitutional "waiting period"—and on that fundamentally mistaken basis, seeks to facially invalidate them.

The Complaint is fatally flawed in several respects. Initially, as a factual matter, the United States lacks standing to challenge either of the statutes, because where no one has attempted to obtain a firearm using the Section 624.7132 procedure in recent years, it necessarily follows that there has been no actual injury to anyone's constitutional rights via Section 624.7132—and without any injury to anyone, standing (under any theory) simply cannot exist. Similarly, nor is there any plausible threat of "real and immediate" constitutional injury to residents of either City under either statute, as needed for the prospective relief the United States here seeks. Additionally, the plain text of Section 12601 simply does not allow the kind of facial challenge that the United States purports to bring here; nor, even if such a facial attack were theoretically possible, has the United States pled any Second Amendment violation under either step of the governing *Bruen* test—under which it is pellucidly clear that background checks of reasonable duration are perfectly compatible with the Second Amendment. Further, insofar as the United States's claim were alternatively to be construed as an "as-applied" challenge, the Complaint fails to plausibly allege that either City has a "pattern or practice" of taking an unconstitutional amount of time to process the background checks. And finally, in the alternative, the Cities are entitled to summary judgment as the full data pertaining to all applications received by both Cities the past three years shows that the actual processing time is fully within reasonable constitutional limits.

In sum, the United States brings an utterly meritless case. It lacks Article III standing, has failed to state a claim as a matter of law and, if this case went forward, it will be unable to support its claims against the Cities.

## STATUTORY BACKGROUND

Minnesota residents seeking to obtain a pistol or semiautomatic military-style assault weapon (collectively, "covered firearms')[1] from a firearms dealer[2] have three alternative options.

**First**, if the purchaser holds a validly issued permit to carry under Minn. Stat. § 624.714, they may also use that permit to purchase a covered firearm. Minn. Stat. §§ 624.7131, subd. 9; 624.7132, subd. 8.[3] A permit to carry is good for five years and may thereafter be renewed. Minn. Stat. § 624.714, subd. 7(c).

**Second**, the prospective purchaser may apply under Section 624.7131 for a **"transferee permit."** Under this process, the purchaser submits certain specified information to the police department of the municipality in which the person resides. Minn Stat. § 624.7131, subd. 1. Upon receipt, the police department "check[s] criminal histories, records and warrant information relating to the applicant" and, *inter alia*, "mak[es] a reasonable effort to check other available state and local record-keeping systems." *Id.* subd. 2. The police department must either issue a transferee permit or—if an enumerated grounds for denial

---

[1] Sections 624.7131 and 624.7132 apply only to transfers of pistols and semiautomatic military-style assault weapons—both of which are defined by Minn. Stat. § 624.712 subds. 2 and 7, respectively; *see also id.* subd. 6.

[2] This suit does not implicate Minn. Stat. § 624.7134, which applies to transfers of covered firearms between private parties.

[3] Plaintiff does not challenge Minn. Stat. § 624.714. Compl. ¶ 3.

applies, *see id.* subd. 4[4]—deny the application within 30 days, *id.* subd. 5. **There is no waiting period attendant to the Section 624.7131 process;** rather, the police department will issue or deny the permit as soon as it has completed the required investigation. *See generally* Minn. Stat. § 624.7131; *see also* Casanova Decl. ¶ 8; Gangnon ¶ 21. A transferee permit is valid statewide for one year, and may thereafter be renewed. *Id.* subd. 6. There is no limit on how many covered firearms the permitee may use the transfer permit to acquire, nor are there any fees attendant to this process. *Id.* subd. 5(c). One-hundred percent of the applications made to both the Minneapolis Police Department ("MPD") and the Saint Paul Police Department ("SPPD") MPD and SPPD within, at least, the last six years have been made under Section 624.7131. Gangnon ¶¶ 8–10; Casanova Decl. ¶ 4.

**Third**, the prospective purchaser may have the prospective seller (the "transferor") of the covered firearm submit, on the prospective purchaser's behalf, a **"report of transfer"** application pursuant to Section 624.7132. The necessary information about the transferee and the disqualifying criteria mirrors Section 624.7131; however, the process is slightly different. First, the transferor must also disclose certain information about itself, and sign and submit the application. *Id.* subd. 1.[5] Second, if the transferor "receives no written notification of disqualification of the proposed transferee within 30 business days," it is free to make the sale. *Id.* subd. 4. And third, until 30 days have passed, the transferor may not transfer the covered firearm to the buyer, unless the police department "waives all or a portion of the waiting

[4] The grounds for application denial are not at issue in this suit.

[5] A single application form is used for both processes, and is available at https://assets.dps.mn.gov/files/bca/Permit-to-Purchase-Transfer-Application.pdf.

period." *Id.* However, the circumstances that allow for waiver are permissive, and include, *inter alia*, when the police have determined—at any point "prior to the waiting period concluding"—that "the proposed transferee is not disqualified." *Id.*

As explained below, neither MPD SPPD has received a single "report of transfer" application under either Section 624.7132 according to data that goes back at least six years. Gangnon Decl. ¶¶ 8–10; Casanova Decl. ¶ 4. Thus, the 30-day "waiting period" provided for in Section 624.7132 has not been applied to a single Minneapolis or Saint Paul resident within this timeframe.

## FACTS

### I. Minneapolis Has Not Received a Report of Transfer or Enforced Section 624.7132 in, at least, Seven Years

Since 2023, MPD has had a single officer designated to review permit applications, Sergeant Phillip Gangnon. Gangnon Decl. ¶¶ 1–2. Each incoming application is logged in a spreadsheet which notes the date received, the name of the applicant, the applicant's date of birth, the application type, approval/denial status, and the date the approval or denial issued. *Id.* ¶¶ 6–7.

For every entry in this spreadsheet, under "Type," it lists "PP" which stands for Permit to Purchase. *Id.* ¶ 8. This indicates that it is an application under Section 624.7131. *Id.* No entry in the spreadsheet, which dates back to 2019, indicates that anyone has ever submitted a Report of Transfer pursuant to Section 624.7132. *Id.* ¶ 9. In this time, Minneapolis has not received a Transfer Report under Section 624.7132. *Id.* ¶ 10. MPD has never had to enforce Section 624.7132. *See id.* ¶¶ 10–11. Nor has the Minneapolis City Attorney's Office, which is

responsible for the prosecution of gross misdemeanor offenses committed in Minneapolis, charged anyone with violating Section 624.7132, subd. 15. Dixon Decl. ¶¶ 2–4.

## II. Minneapolis Processes over 1,000 Transferee Permit Applications Yearly, and Most Applications Are Processed in Eight Days or Less

After the current version of Section 624.7131 went into effect on August 31, 2023, until September 30, 2026, the MPD has received and processed 4,229 transferee permit applications pursuant to this statute. Gangnon Decl. ¶ 23. Each of those applications has been tracked in a spreadsheet noting the date received by the MPD and when the permit approval or denial issued. *Id.* ¶ 7. Of those 4,229 applications, 55.0% were processed in eight days or less, 68.4% were processed in 10 days or less, 82.8% were processed in 14 days or less, 96.2% were processed in 21 days or less, and 99.7% were processed in 30 days or less. Brey Decl. ¶¶ 7, 10e & n.1. There are only 13 instances of these 4,000+ applications where an application was not processed within 30 days.[6] On average, the MPD processes applications in less than 10 days. Brey Decl. ¶ 7. Most often, the MPD processes the application in 7 days. *Id.*

## III. Saint Paul Has No Record of Receiving A Report of Transfer Under Section 624.7132 In Recent Years, Or Of Prosecuting A Violation Of That Statute.

SPPD Records Unit Administrator Molly Casanova's job duties have included, since December 2019, overseeing SPPD's processing of reports of transfer that might be submitted on behalf of Saint Paul residents under Section 624.7132, had SPPD received any. Casanova Decl. ¶¶ 2–4. SPPD, however, has no record of receiving a request to process a report of transfer under Section 624.7132 since at least January of 2022, which is when its available

[6] *See* Gangnon Decl. ¶¶ 25a-i for an explanation of extenuating circumstances behind these 13 instances.

records begin. *Id.* ¶ 4. Ms. Casanova also has no memory of SPPD receiving such a request to process a report of transfer since December 2019. *Id.* Further, the Saint Paul City Attorney's Office's ("SPCAO") (which prosecutes misdemeanors committed in the City of Saint Paul) case management system does not return a record of SPCAO prosecuting a violation of Section 624.7132. McConaughey Decl. ¶¶ 2–3.

## IV. Saint Paul Also Processes Over 1,000 Permit Application Yearly, With Most Applications Since September 1, 2023 Being Processed In 14 Days Or Less.

After the current version of Section 624.7131 went into effect on August 31, 2023, through when this lawsuit was filed on September 24, 2026, SSPD received 3,468 transferee permit applications pursuant to this statute. Casanova Decl., ¶¶ 9–10 & A, B. SPPD maintains a spreadsheet tracking permit applications. *Id.* ¶ 9. This spreadsheet includes the date on which each application was received and an approval or rejection issued. *Id.* ¶¶ 9–10. Of the 3,468 applications received from September 1, 2023 through August 24, 2026, 19.4% were mailed in seven days or less, 63.9% in 14 days or less, 86.3% in 21 days or less, and 95.3% in 30 days or less. *Id.* Ex. B. Notably, processing numbers would be even faster but for a unique cybercriminal attack[7] that deprived SPPD of internet access, and accordingly the tools necessary to complete the background checks necessary to process permit applications, from approximately mid-July to the end of September 2025, after which SPPD needed to catch up on application backlog. *Id.* ¶ 12.

---

[7] *See* https://www.stpaul.gov/departments/emergency-management/cyber-incident-info-hub (last visited November 9, 2026).

## LEGAL STANDARDS

### I. Rule 12(b)(1) Factual Challenge

"A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). As relevant here, "in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* at 914–15 (citation modified). In that case, "the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn*, 918 F.2d at 729 n.6.

### II. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). A court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Id.* at 792. But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not establish a plausible allegation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III. Rule 56

Summary judgment is proper if "there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## ARGUMENT

### I. Plaintiff Has Not Suffered Any Cognizable Injury in Fact and Thus Lacks Standing

"This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in *actual controversies*.'" *United States v. Raines*, 362 U.S. 17, 21 (1960) (emphasis added) (citation omitted). Article III standing is the "irreducible constitutional minimum" required to maintain a lawsuit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted). The first, and, for Plaintiff, insuperable requirement for standing is an injury in fact. *Id.*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan,* 504 U.S. at 560). Plaintiff relies on Section 12601 to provide standing to bring this suit. Compl. ¶¶ 10–11, 38–41. Section 12601 allows the United States to seek declaratory and injunctive relief where there is a "pattern and practice" of "conduct by law enforcement officers … that deprives persons of rights, privileges, or immunities secured or protected by the Constitution … of the United States." 34 U.S.C. § 12601. Thus, the predicate "injury" that provides the Attorney General with a cause of action under Section 12601 is not to the United States itself, but rather to "persons" who have been subjected to "patterns and practices" of conduct within the meaning of the statute. "Just as an association suing on behalf of its members must show not only that it represents the members but that at least one satisfies Article III requirements, so too a [a government asserting a claim] as *parens patriae* must still show that its citizens satisfy

Article III." *Massachusetts v. E.P.A.*, 549 U.S. 497, 538 (2007) (Roberts, J., dissenting). Additionally, a statute cannot provide Article III standing on its own. *Spokeo*, 578 U.S. at 339; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). Thus, before Plaintiff can invoke Section 12601, there must be citizens have suffered or are foreseeably likely to suffer an injury in fact.

Plaintiff alleges that because Section 624.7132 "prohibits individuals from purchasing" a controlled firearm "until 30 days after a transferee report … is delivered to the purchaser's local chief of police or sheriff," this "effectively creates a 30-day waiting period for Minnesotans[.]" Compl. ¶¶ 15–16. Regardless of whether Plaintiff's characterization of Section 624.7132 is correct (it is not), the facts are that in Minneapolis and Saint Paul, *no one* has attempted to obtain a firearm using the procedure in Section 624.7132 going back at least six years. Gangnon Decl. ¶ 9; Casanova Decl. ¶ 4. It follows necessarily that there has been no actual injury to *anyone*'s constitutional rights via Section 624.7132—and without any injury to anyone, standing (under any theory) simply cannot exist.

Further, with respect to *both* Sections 624.7131 and 624.7132, because Plaintiff seeks prospective relief, it must show "a real and immediate threat" of future injury, here, to the individuals whose injuries Section 12601 is meant to remedy. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (to provide a basis for Article III standing, a future harm that, definitionally, has yet to occur must be "certainly impending"). Plaintiff cannot establish standing by speculating that someone *might* apply under Section 624.7132 when years have passed with exactly zero applications. Similarly, Plaintiff cannot show "certainly impending" future injury under Section 624.7131 as to any Saint Paul or Minneapolis resident. In recent years, the Cities have taken more than 30 days to review permit

applications on vanishingly rare occasions. *See* Gangnon Decl. ¶ 25; Casanova Decl. ¶ 12; Ex. B. Given these facts, Plaintiff cannot plausibly show that any "pattern and practice" of issuing Transferee Permits in violation of the Second Amendment has any probability of occurring *at all* in the future—much less that one is "certainly impending."

Regardless of Plaintiff's *parens patriae* authority, without *any* actual or imminent injury to *anyone*'s rights, Plaintiff has no standing to pursue injunctive relief on anyone's behalf. This Court should dismiss Plaintiff's claims for lack of standing.

## II. The Complaint Should Be Dismissed Under Rule 12(b)(6)

To the extent, *arguendo*, that the Court finds that it has jurisdiction to assess Plaintiff's claim, it must in any event be dismissed for failure to meet the federal pleading standard, on several different grounds.

### A. Section 12601 Does Not Authorize Facial Challenges

Plaintiff asserts its sole cause of action in this case under a novel—and, ultimately, specious—reading of Section 12601. It appears Plaintiff purports to employ Section 12601 to challenge the Cities' alleged enforcement of Sections 624.7131 and 624.7132, *i.e.* to conduct certain specified background checks and, if the prospective purchaser of a covered firearm is qualified under state and federal law, to issue a permit (to the purchaser) or a "report of transfer" (to the seller) that formally authorizes the transaction. Notably, Plaintiff *does not challenge* the substantive grounds for disqualification set forth in the Minnesota Statutes—nor does it deny that it is perfectly acceptable for a state or locality to require background checks that, as here, "ensure only that those bearing arms … are, in fact, law-abiding, responsible citizens." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022). Nonetheless, Plaintiff asserts that when the Cities simply carry out these statutory duties, they

are somehow—and moreover, somehow *by definition*—violating Minnesotans' Second Amendment rights. *See* Compl. ¶ 4 ("The Cities' law enforcement officers are charged with enforcing the State's unconstitutional restrictions and are doing so. Such law enforcement conduct is unlawful pursuant to 34 U.S.C. § 12601(a)."); *id.* ¶ 27 ("[T]he Minnesota Scheme is presumptively unconstitutional."); *id.* Prayer for Relief ¶¶ A–B (seeking declaratory and injunctive relief prohibiting any implementation of the Minnesota Statutes by the Cities). Even if these conclusory allegations were true—which they are not—the asserted violations would arise directly from the Minnesota Statutes, not from any "pattern and practice" of misconduct, as that term is used in Section 12601.

Thus, although the Complaint is unclear whether Plaintiff *intends* to bring a facial or an as-applied challenge to the Minnesota Statutes, both the gravamen and the practical effect of Plaintiff's claim is that *any enforcement whatsoever* of the Minnesota Statutes (by the named local defendants, Minneapolis and Saint Paul) is unconstitutional and should be enjoined—which is, necessarily, a facial challenge. *See City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 879 (9th Cir. 2009) ("[A] challenge to . . . statutory requirements is a facial challenge to the statute itself, not a 'pattern and practice' claim."). For the reasons set forth below, the United States's construction of Section 12601 is both ahistorical and atextual, and does not withstand scrutiny. Section 12601 does not authorize facial attacks of duly-enacted state laws—and thus, it does not authorize the claim asserted here. *United States v. Montgomery Cnty., Md.*, No. CV 26-3025-TDC, 2026 WL 3386118, at *6–9 (D. Md. Nov. 9, 2026) (denying preliminary injunction on a Section 12601 claim by DOJ against a county's enforcement of state firearm law in part

because it was, impermissibly, "essentially a facial challenge"). The Court should dismiss this suit on this ground alone.

### 1. Text and Legislative History

Enacted in 1994, Section 12601 authorizes a cause of action to redress "a pattern or practice of conduct by law enforcement officers" that deprives persons of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" 34 U.S.C. § 12601.[8]

As explained by a House committee report, the statute was enacted to address a specific problem: "the problem of excessive force" by law enforcement officers, "which is a serious one." H.R. Rep. No. 102-242, at 136.[9] The report detailed the beating of Rodney King by the LAPD and found that it was "not an aberration," either within the LAPD or more generally throughout the country. *See id.* at 135 (finding that "[p]olice use of excessive force is a significant problem in this country"). The committee further found that "the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices such as the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138. Further, in light of the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 137 (1983),

---

[8] Section 12601 was previously codified at 42 U.S.C. § 14141.

[9] Section 12601 originated in the proposed Police Accountability Act of 1991, which did not become law. It was carried over, with slight revisions, to the Violent Crime Control and Law Enforcement Act of 1994. Because Section 12601 has no direct legislative history, courts and the Justice Department have looked to the history of the Police Accountability Act, where it was originally drafted. *See, e.g., United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000).

individual plaintiffs could not, "absent a showing of likely future harm," seek injunctive relief to prevent such tactics—thus creating a "gap in the law" where neither individual litigants "nor anyone else" could eliminate systemic constitutional violations caused by "police brutality." *Id.* at 137–38.

Section 12601 was, thus, enacted for the purpose of "clos[ing] this gap in the law, [by] authorizing the Attorney General . . . to sue for injunctive relief against abusive police practices." *Id.* at 138. The cause of action it affords is specifically targeted to "pattern and practice" *misconduct* by law enforcement. It was not intended to endow the federal government with—and as explained below, does not textually support—a free-standing cause of action by which it can sue (notwithstanding its own indisputable lack of injury, *see supra* Section I) to facially invalidate duly-enacted state laws. *See Montgomery Cnty.*, 2026 WL 3386118, at *10–11 (concluding that the legislative history of Section 12601 did not support facial challenges).

### 2. Past Practice

The Justice Department developed standard procedures and practices for Section 12601 cases. Brey Decl. Ex. E at 1–2 (DOJ report).[10] Section 12601 cases have historically been handled by the Special Litigation Section in the Civil Rights Division, which "consists of career professional attorneys with many decades of collective experience working on police reform cases." *Id.* at 3. A Section 12601 case is supposed to, and, until the current

---

[10] The Court may properly take judicial notice of this official public document, as well as the other Department of Justice documents cited in this section, without converting the Cities' Rule 12(b)(6) motion into one for summary judgment. *See, e.g.*, *Aguilar v. United Floor Crew, Inc.*, No. 14-CIV-61605, 2015 WL 2415421, at *6 (S.D. Fla. May 21, 2015) ("judicial notice may be taken of public records and government documents available from reliable sources"); *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

Administration, did begin with an internal inquiry of whether to open an investigation into a police department's conduct. *Id.* at 5. After that preliminary inquiry, if the Special Litigation Section recommends opening an investigation and the Assistant Attorney General agrees, the Civil Rights Division notifies the jurisdiction's chief executive officer and chief legal officer. *Id.* at 8. Then the existence of the investigation is made public. *Id.* Historically, pattern-and-practice investigations have been comprehensive, typically taking at least a year. *Id.* at 9–10, 14. At the end of the investigation, if the Division found reasonable cause, it would notify the jurisdiction of its specific conclusions supporting that determination. *Id.*

The Division's focus would then shift to working cooperatively with the jurisdiction to achieve an agreed resolution to "avoid contentious litigation and begin the process of reform as quickly as possible." *Id.* at 17, 18. Only if a reform agreement could not be reached would the Division bring a lawsuit. *Id.* at 2, 18. None of these steps were followed prior to Plaintiff's initiation of the instant lawsuit.

Further, to the Cities' knowledge, until late last year, the Justice Department had never attempted to use a Section 12601 case to bring a facial challenge to a state or local statute. *See id.* at 41–48 (summarizing past cases). No Court has yet to issue a reasoned opinion accepting the Justice Department's unfounded interpretation, which would arrogate to the federal government considerable new power in relation to the states and thus meaningfully alter the balance of power in our federalist system of government. *Cf. Younger v. Harris*, 401 U.S. 37, 44 (1971); *see Montgomery Cnty.*, 2026 WL 3386118, at *11–15 (denying preliminary injunction in part on the ground that DOJ's purported new use of Section 12601 is inconsistent with the separation of powers, federalism, and DOJ's past use of statute); *see also United States v.*

*California*, No. 8:26-CV-01697-MRA-ADSX, 2026 WL 2004372, at *3 (C.D. Cal. July 9, 2026) (denying TRO in part because DOJ's new use of Section 12601 is, "at the very least, a novel approach that deviates from the way the statute has historically been enforced").

"A longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred." *Biden v. Nebraska*, 600 U.S. 477, 519 (2023) (Barret, J., concurring) (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)); *see also Learning Resources, Inc. v. Trump*, 607 U.S. 628, 643 (2026) ("The fact that no President has ever found such power in [the statute] is strong evidence that it does not exist."); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("The longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is."). In assessing the novel theory advanced by this action, it is appropriate for this Court to bear in mind this relevant history, and the unprecedented nature of the sweeping authority that the Department of Justice seeks to claim for itself.

### 3. The Plain Text of Section 12601 Requires Dismissal

Plaintiff asks this Court to ignore this history and plain text of Section12601. The Court should decline the invitation.

Where, as here, a case presents an issue of statutory interpretation, the Court's task "is 'to give effect to the will of Congress,' and 'determine the best reading of the statute.'" *United States v. Simon*, No. 25-CV-3761 (KMM/EMB), 2026 WL 2389778, at *8 (D. Minn. Aug. 17, 2026) (citations omitted). "When a statute is unambiguous, interpretation both begins and ends with the text," *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834 (8th Cir. 2022), but when a statute's terms are not defined, courts give them the "ordinary meaning at

the time Congress enacted the statute." *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021). "The ordinary meaning of terms can be discerned from 'simple dictionary definition[s] from the time of the statute's enactment,' considered in combination with the statute' s broader purpose and context." *Simon*, 2026 WL 2389778, at *8 (quoting *Sanzone v. Mercy Health*, 954 F.3d 1031, 1040–41 (8th Cir. 2020)).

Here, these principles of statutory interpretation all confirm that Section 12601 does not endow Plaintiff with authority to sue to invalidate duly enacted state laws, on the theory that any potential enforcement of the statute is, definitionally, a "pattern and practice" under Section 12601. Instead, the statute provides a much narrower cause of action focused on instances in which the federal government has determined (following an actual investigation) that the actions of certain specific actors ("law enforcement officers") constitute routine ("a pattern or practice of") misconduct that is abusive of constitutional rights. 34 U.S.C. § 12601.

Contemporary dictionary definitions confirm this understanding of the statute—specifically, that Section 12601 addresses *how* officers *perform* their duties, as opposed to what duties are imposed by a state legislature. A "pattern" is "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution," and a "practice" is "a repeated or customary action" or "the usual way of doing something." *Pattern*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) ("Merriam-Webster's") at 853; *Practice*, Merriam-Webster's at 914. Similarly, "conduct" is the "act, manner, or process of carrying on." *Conduct*, Merriam-Webster's at 240; *see also Conduct*, Black's Law Dictionary (6th ed. 1990) ("[p]ersonal behavior; deportment; mode of action"). And "by" means "through the agency . . . or instrumentality of." *By*, Merriam-Webster's at 157. Taken together, these terms

limit a challenge to demonstrated actions, tendencies, conduct, and behavior—*i.e.*, to the *manner in which* a given group of officers are performing their duties—which is categorically distinct from the type of facial attack Plaintiff purports to bring here. Thus, these definitions confirm that Congress established a cause of action to allow the Department of Justice to address demonstrated patterns of abusive conduct by identified groups of law enforcement officers—not state legislators in enacting laws reflecting the policy views of their constituencies.

Additionally, Section 12601 requires that officers' conduct *itself causes* the asserted deprivation of rights. The clause "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" is a restrictive relative clause that modifies the preceding text, such that the challenged pattern of conduct must be the source of the alleged deprivation. *See United States v. Nishiie,* 996 F.3d 1013, 1021–22 (9th Cir. 2021) (noting that "[r]estrictive relative clauses are usually introduced by *that* . . . and are never set off by commas from the rest of the sentence" and that such clauses provide "information that is essential to understanding the intended meaning of the rest of the sentence" (citation omitted)); *see also Fla. Agency for Health Care Admin. v. CMS*, 161 F.4th 765, 782 (11th Cir. 2025). Where—as here—the allegation is that law enforcement officers are enforcing state law and there are no allegations that there is something unlawful or abusive about *how* the officers are conducting that enforcement, it follows that the claim is improperly directed to the state law itself and not to any pattern, practice, or conduct by particular law enforcement officers. *Compare* Compl. ¶ 4 ("The Cities' law enforcement officers are charged with enforcing the State's unconstitutional restrictions and are doing so. Such law enforcement

conduct is unlawful pursuant to 34 U.S.C. § 12601(a).”). Where a different act—such as an enactment by a state legislature—causes the alleged deprivation, it follows that there is no “pattern or practice” by law enforcement officers within the scope of Section 12601.

Finally, Section 12601’s placement within the U.S. Code also confirms that it does not authorize facial challenges to state laws. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (looking to “the title of a statute and the heading of a section” as interpretive aids). Section 12601 is codified in Title 34 “Crime Control and Law Enforcement,” Chapter 121 “Violent Crime Control and Law Enforcement,” Subchapter VIII “State and Local Law Enforcement,” Part B “Police Pattern or Practice.” Those headings confirm that Section 12601 is directed to chronically abusive law enforcement conduct, not state laws. The sole additional section in Part B directs the Attorney General to “acquire data about the use of excessive force by law enforcement officers,” a responsibility that is adjacent to federal monitoring of local police misconduct—but has absolutely nothing to do with the sweeping purported authority to facially challenge state laws that the Department of Justice attempts to arrogate to itself in this action.

The self-aggrandizing interpretation of Section 12601 Plaintiff advances is ahistorical, atextual, and should be soundly rejected. At bottom, “[i]f Congress had intended” to bestow the Department of Justice with a roving license to facially challenge state or local laws, “it easily could have drafted language to that effect.” *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 429 (2022); *cf. Whitman v. Am. Trucking Assoc’s*, 531 U.S. 457, 468 (2001) (Congress “does not, one might say, hide elephants in mouseholes”). It did not, and this case should be

dismissed as plainly unauthorized by the limited cause of action that Congress did choose to enact.

### B. Plaintiff Has Not Plausibly Pled a Facial Claim

#### 1. Plaintiff's Claim Fails at Both Steps of the *Bruen* Test

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *New York State Rifle & Pistol Ass'n v. Bruen*, established a two-part test to determine whether a law is consistent with the Second Amendment. 597 U.S. 1 (2022). At *Bruen* step one, the Court asks whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. As recently clarified by *Wolford v. Lopez*, 609 U.S. 185, 196 (2026), this plain-text analysis "entails three subsidiary questions": whether (1) the law applies to "the people," defined to mean "all members of the political community" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008); (2) the law concerns "any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes"; and (3) the law restricts "either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms" (alterations in original). As Plaintiff recognizes, "the plaintiff has the burden" of demonstrating satisfaction of *Bruen* step one, *i.e.* of establishing that 'the Second Amendment's plain text" encompasses the "conduct" at issue. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("*RMGO*") (quoting *Bruen*, 597 U.S. at 17); Compl. ¶ 28 (acknowledging that "[t]he burden under *Bruen* step one is on the party attacking the law" (here, the United States . . .))."

"If the text does not extend to the desired conduct, that conduct falls outside the ambit of the Second Amendment, and the government may regulate it." *Bianchi v. Brown*, 111 F.4th 438, 446 (1st Cir. 2024); *accord Giambalvo v. Suffolk Cnty., New York*, 155 F.4th 163, 176 (2d Cir. 2025) (where the challenged conduct is not encompassed by the Second Amendment's plain text, "the constitutional inquiry ends, and a plaintiff's challenge to the law fails"); *McCoy v. Jacobson*, 176 F. 4th 1055, 1057 (8th Cir. 2026) (similar). If, on the other hand, the plaintiff does meet its burden at step one, a "presumption" that "the Constitution . . . protects [the challenged] conduct" will apply. *Bruen*, 597 U.S. at 24. At *Bruen* step two, the defending government may then rebut this presumption "by demonstrating that [the challenged regulation] is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Insofar as Plaintiff intends to facially challenge the Minnesota Statutes, the laws pass the *Bruen* test. Specifically, the federal government's claim fails—at minimum—at *Bruen* step one (subpart 3) because the Second Amendment says nothing about any right to purchase or otherwise acquire arms—much less to do so immediately and unconstrained by any process meant to "ensure only that those bearing arms . . . are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9. The federal government's claim also fails at *Bruen* step two.

In *Heller*, 554 U.S. at 582–84, the Supreme Court expounded upon the "normal and ordinary" meaning of "to keep and [to] bear" from the text of the Second Amendment. The Court explained that Founding-era dictionaries defined the word "keep" as "to retain; not to lose," and "to have in custody;" in short, "to have weapons." *Id.* at 582. The word "bear" meant "to carry," but in the context of arms, specifically "carrying for a particular purpose—confrontation," *id.* at 584, which the Supreme Court has elsewhere clarified means "a right to

keep arms for self-defense." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 768 (2010). Thus, putting both of these pieces together, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, for the specific purpose of "self-defense," *McDonald*, 561 U.S. at 768.

"Notably absent" from *Heller*, however, is "any discussion of an ancillary, non-textual right to *acquire* firearms." *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 208 (D. Vt. 2024) (emphasis added), *appeal filed* July 31, 2024 (2d Cir. Dkt. No. 24-2026).[11] Thus, as the Fifth Circuit recently explained in upholding background checks, "[t]he plain text [of the Second Amendment] covers plaintiffs' right 'to keep and bear arms.' . . . And on its face "keep and bear" does not include purchase—let alone without [a] background check." *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024); *accord Beckwith v. Frey*, 171 F.4th 560, 567 (1st Cir. 2026) (emphasis added) (citation omitted), *cert denied*, --- S. Ct. ---, 2026 WL 3116649 (Oct. 19, 2026) (finding Maine law imposing 72-hour waiting period "regulates conduct *that occurs before a person keeps or carries* a gun. Accordingly, applying *Bruen*'s plain text analysis, the Act imposes conditions and qualifications on the commercial sale of firearms that do not directly restrict the textual rights protected by the Second Amendment"); *RMGO*, 121 F.4th at 120 ("[L]aws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment."); *Mills v. New York City,* 758 F. Supp. 3d 250, 266 (S.D.N.Y. 2024), *appeal filed* Dec. 20, 2024 (2d Cir Dkt. No. 24-3308) ("[N]othing

[11] This distinction, moreover, is not surprising. The impetus for the Second Amendment was not a desire to guarantee unregulated sales of firearms, but instead the fear that the federal government might try to disarm the populace, as King George III had attempted to do. *McDonald*, 561 U.S. at 768-69.

in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time."); *Vermont Fed'n*, 741 F. Supp. 3d at 209 ("The Court finds that the relevant conduct—acquiring a firearm through a commercial transaction on-demand—is not covered by the plain text of the Second Amendment. Plaintiffs may keep and bear arms without immediately acquiring them."); *United States v. Sam*, No. 23-CR-324 (2) (NEB/LIB), 2024 WL 2354593, at *1 (D. Minn. May 23, 2024) (rejecting the argument that "without the right to purchase firearms, the right to bear arms would be meaningless").[12]

This textual understanding is, moreover, both consistent with and necessary to give meaning to the Supreme Court's repeated instruction that certain kinds of firearm regulations—including "prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms"—are "presumptively lawful" under the Second Amendment. *Heller*, 554 U.S. at 626–27 & n. 26; *see also McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'") (quoting *Heller*, 554 U.S. at 626–27); *United States v. Rahimi*, 602 U.S. 680, 735 (2024) (Kavanaugh, J., concurring) (similar); *Bruen*, 597 U.S. at 39 n.9 (explaining that "nothing in our analysis should be interpreted" to undermine the constitutionality of "a

[12] *Cf. New York State Firearms Ass'n v. James*, 157 F.4th 232, 245 (2d Cir. 2025); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc).

background check" that is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'") (quoting *Heller*, 554 U.S. at 635); *id.* at 80–81 (Kavanaugh, J., concurring) (noting that rules which require a prospective firearm purchaser "to undergo fingerprinting, a background check, [or] a mental health records check . . . are constitutionally permissible"); *McRorey*, 99 F.4th at 836 (observing that "*Bruen* did nothing to disturb" *Heller*'s description of "conditions and qualifications on the commercial sale of arms" as "presumptively lawful") (citation omitted). "After all, any law that is 'presumptively lawful' … necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would 'presumptively *protect*[] that conduct[.]'" *B & L Productions, Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) (quoting *Bruen*, 597 U.S. at 17); *see RMGO*, 121 F.4th at 120 (accord). In short, the same law cannot be both presumptively constitutional and presumptively unconstitutional—and the Supreme Court has repeatedly instructed that "conditions and qualifications on the commercial sale of arms," like the background checks challenged here, are presumptively constitutional.

Indeed, only mere months ago, ***Plaintiff itself* expressly argued in federal court that while "'[t]he right to 'keep and bear' can implicate the right to purchase . . . such an *implication* is not the same thing as being *covered by* the plain text of the amendment.**'" Brey Decl. Ex. B at 18 (quoting, with approval, *McRorey,* 99 F.4th at 838). Thus, as Plaintiff only recently emphasized, "[n]othing in *Bruen* suggests, much less implies, that the Second Amendment's plain text covers commercial sale of firearms *without* abiding by," reasonable "background check requirements. To the contrary, … *Bruen* 'did nothing to disturb [the] part of *Heller*' that **'**described 'conditions and qualifications on the commercial

sale of arms' as 'presumptively lawful.'" *Id.* at 19 (quoting *McRory*, 99 F.4th at 836).[13] And because—as Plaintiff there agreed—"ancillary firearm regulations . . . preceding [the] sale" of firearms, do not "violate anyone's right to 'keep and bear Arms,'" *id.* at 18, "no historical inquiry" at *Bruen* step two is necessary when a background check requirement is challenged, *id.* at 19 (collecting cases resolving Second Amendment claims at step one).

Thus—as Plaintiff itself argued in federal court just two months before initiating this action—the Second Amendment confers a right to retain arms, not an unfettered right to immediately acquire them free of any regulation. Because Minnesota's background checks implicate neither the right to "keep" nor to "bear" arms, "the constitutional inquiry ends" at *Bruen* step one, and [the United States's] challenge to [the Minnesota Statutes] fails," *Giambalvo*, 155 F.4th at 176; *see also, e.g.*, *McRorey*, 99 F. 4th at 838–39 (upholding 10-day federal background checks without conducting any historical analysis).

Finally, Plaintiff's claim also fails at *Bruen* step two. As *Rahimi* noted, the history of firearm regulations "confirm[s] what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." 602 U.S. at 698. These mechanisms are "relevantly similar" to background check processes, such as those under Sections 624.7131 and 624.7132, *see id.* at 692. Plaintiff, too, has repeatedly

[13] While the district court ruled against the federal government in this case, its decision did not disagree with these principles but instead reframed the question at issue, holding that "[t]he Parties do not appear to dispute that the conduct at issue—individuals making or repairing firearms—is covered by the Second Amendment. Thus, such activity is presumptively constitutional, and any effort to restrict this right 'is presumptively unconstitutional.'" *Def. Distributed v. Blanche*, --- F. Supp. 3d ---, No. 4:22-CV-00691-O, 2026 WL 2413200, at *8 (N.D. Tex. Aug. 17, 2026) (citing *Wolford*, 609 U.S. at 186).

taken the position—including just this year—that "government regulation to ensure only law-abiding citizens acquire firearms dates back to pre-colonial English practice." Brey Decl. Ex. A at 36; *see also id.* Ex. C at 32 ("Background-check measures such as the one at issue here comport with precedent, history, and tradition."). The Cities incorporate Plaintiff's arguments in those cases by reference. Plaintiff's claim here fails at both steps of *Bruen*.

**2. Plaintiff Also Does Not—and Cannot—Allege There Are "No Set of Circumstances" under which the Statutes Would Be Valid**

Insofar as Plaintiff brings a facial challenge to the Minnesota Statutes, the claim also fails on the independent ground that Plaintiff does not—and cannot—come anywhere close to meeting the pleading standard for such a claim. A claim of facial unconstitutionality is "the most difficult challenge to mount successfully," *Rahimi,* 602 U.S. at 693, "'since the challenger must establish that no set of circumstances exists under which the Act would be valid,'" *United States v. Evans*, 175 F.4th 950, 954 (8th Cir. 2026) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Conversely, to prevail on a facial challenge, the Cities "need only demonstrate that [the Minnesota statutes are] constitutional in some of [their] applications." *Rahimi,* 602 U.S. at 693.

As explained above, Sections 624.7131 and 624.7132 require that a Minnesota resident who seeks to purchase a pistol or semiautomatic military-style assault rifle undergo a background check, meant to "ensure only that those bearing arms in [Minnesota] are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9. Both laws set an outer limit of 30

days[14] for the relevant police department to process an application, once it is received—but under both statutes, the permit or authorization for the transfer may issue*at any time after the necessary checks for the prospective purchaser's eligibility have been completed. See generally* Minn. Stat. § 624.7131; *see also* Minn. Stat. § 624.7132, subd. 4 (allowing the police department to approve a "report of transfer" application at any point "prior to the waiting period concluding" if it has been determined that "the proposed transferee is not disqualified"). In other words, *neither statute sets any minimum period* which an applicant under the statute must wait in order to proceed with the desired purchase of the firearm; to the contrary, if the necessary checks are returned quickly and do not require any follow-up, the permit or authorization for transfer may issue as soon as the same day that the application under either statute is received. Thus, in order to plead a facial claim, Plaintiff would need to contend that even where an application is processed within a day or two, the background checks required by the Minnesota Statutes violate the Second Amendment.

The Complaint makes no such contention. Nor could it: courts have consistently approved of background checks and reasonable processing periods for conducting checks. *See, e.g.*, *Bruen*, 597 U.S. at 38 n.9; *McRorey*, 99 F.4th at 839–40; *Maryland Shall Issue, Inc. v. Maryland*, 116 F.4th at 226–27; *Giambalvo*, 155 F.4th at 1183–84. That includes a court in this District. *See Elgersma v. NICS*, No. 24-CV-4458 (LMP/DJF), 2025 WL 1907402, at *4 (D. Minn. July 10, 2025).

[14] As noted elsewhere, in point of fact both the MPD and the SPPD *do* consistently process incoming Section 624.7131 applications in significantly shorter timeframes than the outer statutory limit allows. However, the Cities do not rely on these facts in the context of this argument made under Rule 12(b)(6).

In fact, *Plaintiff itself* approves of background checks. In at least two briefs filed within a few months of the Complaint in this matter, Plaintiff has argued in favor of the constitutionality of background checks. Brey Decl. Ex. D at 16 (arguing that the government "may [properly] enact measures 'designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens,'" such as "background checks or shall-issue licensing regimes" (quoting *McRorey*, 99 F.4th at 837)); *id.* at 37 Brey Decl. Ex. B at 23–28 (relying extensively on *Bruen* and *McRorey* to argue for constitutionality of Gun Control Act's licensing, background check, serialization, and recordkeeping requirements).

In sum, Plaintiff does not and cannot dispute that background checks of reasonable duration are constitutional. It therefore cannot show "that no set of circumstances exists" under which Sections 624.7131 and 624.7132 may be applied consistent with the Second Amendment. *See Evans*, 175 F.4th at 954. Thus, to the extent Plaintiff attempts to plead a facial challenge against Sections 624.7131 and 624.7132, it fails. *See Maryland Shall Issue, Inc.*, 116 F.4th at 227 (rejecting facial challenge to statute because applications could be processed much more quickly than the statutory maximum).

### C. Nor Has Plaintiff Plausibly Pled an As-Applied Claim

Finally, Plaintiff's claim fares no better if construed as an as-applied challenge. "An as-applied challenge asks the reviewing court to declare the disputed statute unconstitutional on the facts of the particular case." *United States v. Lehman*, 8 F.4th 754, 757 (8th Cir. 2021) (citation omitted). "The challenge is not 'that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Id.* (quoting, *inter alia*, *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019)).

To be sure, the Cities do not dispute that—as the First Circuit and other courts have explained—"[l]aws that regulate conduct that is outside the Second Amendment's plain text but nevertheless burden a person's right to keep and bear arms are only presumptively constitutional; such laws may still violate the Second Amendment if the regulated party shows that the laws are being 'put toward abusive ends.'" *Beckwith*, 171 F.4th at 565 (quoting *Bruen*, 597 U.S. at 38 n.9). This may occur where, for example, a jurisdiction imposes in practice "'lengthy wait times in processing license applications or exorbitant fees [that] deny ordinary citizens their right to public carry,'" *id.* (quoting *Bruen*, 597 U.S. at 38 n.9); *see also McRorey*, 99 F. at 839 n.18 (observing that even under the Fifth Circuit's reading of the Second Amendment to textually exclude the "purchase" of a firearm, "[t]here is no question that regulations on purchase so burdensome that they act as *de facto* prohibitions on acquisition would be subject to constitutional challenge … ").

But if the federal government purports to assert that the Cities are putting the Minnesota Statutes "to abusive ends" through their administration and enforcement, it makes a grand total of two conclusory allegations in support of such a theory: first, that "[w]aiting periods for approvals from chiefs of police in Saint Paul and Minneapolis commonly exceed the statutory limit of 30 days," Compl. ¶ 20, and second, that "[s]ome [unspecified] citizens have been forced to wait for nearly 60 days," *id.* These constitute quintessential "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which simply "do not suffice" to satisfy the federal pleading standard. *Iqbal*, 556 U.S. at 678.

## III. In the Alternative, the Cities Are Entitled to Summary Judgment

### A. The Cities Are Entitled to Summary Judgment to the Extent the Claim Depends on Any Enforcement of Section 624.7132

For the reasons explained above, *see supra* Section II.A, Section 12601 does not authorize relief against a municipality merely because its officers have been delegated responsibility to implement an allegedly unconstitutional law. Rather, it prohibits law enforcement from "engag[ing] in a pattern or practice of [unlawful] conduct" and authorizes "equitable and declaratory relief to eliminate that pattern or practice." 34 U.S.C. § 12601(a)–(b). So Plaintiff must show that the Cities have actually engaged in unlawful conduct and that there is a pattern or practice to eliminate. The undisputed record forecloses such a finding.

In at least the last six-plus years neither City has received or processed a single report of transfer under Section 624.7132. Gangnon Decl. ¶¶ 8–10; Casanova Decl. ¶ 4. Accordingly, neither City has ever, within that time frame, made a Section 624.7132 transferee wait a single second nor otherwise engaged in any enforcement or administration of Section 624.7132 reports of transfer. *Id.* Because the undisputed record demonstrates the complete absence of the alleged enforcement activity, the Cities are entitled to summary judgment on that theory.

### B. The Cities Are Also Entitled to Summary Judgment to the Extent the Claim Depends on a Pattern or Practice of Unconstitutional Delays

Plaintiff's allegations of a pattern or practice of unconstitutional processing delays have no basis in fact. Plaintiff first alleges that the Cities "commonly" take more than 30 days to process Section 624.7131 applications. Compl. ¶ 20. It is difficult to see how Plaintiff responsibly makes that allegation. As to Minneapolis, since the current iteration of Section 624.7131 went into effect in August 2023, exactly 13 applications out of 4,229, or 0.3%, took longer than 30 days to process. Gangnon Decl. ¶ 25. Those delays, as explained above, were

largely out of Minneapolis' control. *See id.* at ¶¶ 25a–i. And as to Saint Paul, 4.7%—with even that low number largely due to a one-off cybercriminal attack more than a year ago—took longer than 30 days to process. Casanova Decl. ¶ 12; Ex. B. There is no straight-faced reading of the word "commonly" that could support Plaintiff's allegation.

Only a hyper-literal reading of the word "some" could explain Plaintiff's allegation that "[s]ome citizens have been forced to wait nearly 60 days." Compl. ¶ 20. Of the 13 applications that exceeded 30 days for MPD to process, nine were processed within 34 days or less; one was processed in 45 days (from an individual with an unclear civil commitment status); one was processed in 47 days (due to MPD accidentally misplacing the application and asking applicant to reapply); one was processed in 79 days (from an individual with a potentially disqualifying domestic violence charge); and the last was processed in 141 days (from an individual with an extensive in- and out-of-state criminal history). Gangnon Decl. ¶¶ 25a–i. Thus, Minneapolis took longer than 60 days to process a grand total of *two* applications, out of 4,229, from individuals with unusually complicated and potentially serious criminal histories.

SPPD also has few applications that took "nearly 60 days" to process, whatever Plaintiff might specifically mean by that allegation. Other than a number of applications impacted by the 2025 cybercriminal attack (*see* Casanova Decl. ¶ 12; Ex. A pp. 41–42), only five applications exceeded 50 days and only three exceeded 60 in the applicable period. Casanova Decl. Ex. A, pp. 16 (Audit # 3926); 17 (Audit #3925); 20 (Audit ## 4045, 4046); 41 (Audit # 4999). The most recent of that group of five was over a year ago. *Id.* at 41 (Audit # 4999).

Those rare delays do not a pattern or practice make—even assuming *arguendo* they were unconstitutional (which they were not). Section 12601 does not define "pattern or practice," so courts have looked to the meaning that phrase carries in other federal civil rights statutes, particularly Title VII as construed in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977). *See United States v. Johnson*, 122 F. Supp. 3d 272, 347–49 (M.D.N.C. 2015) (applying *Teamsters* to 42 U.S.C. § 14141 before it was recodified as 34 U.S.C. § 12601); *see also Montgomery Cnty.*, 2026 WL 3386118, at *4 (citing *Teamsters* and *Johnson* in interpreting "pattern or practice").Under that standard, Plaintiff must prove that unconstitutional conduct was the agency's "standard operating procedure"—its regular rather than unusual practice—not merely a collection of isolated, sporadic, or accidental incidents. *Teamsters*, 431 U.S. at 336 & n.16; *see also United States v. Big D Enterprises, Inc.*, 184 F.3d 924, 930 (8th Cir. 1999) (applying the same standard under the Fair Housing Act). The 0.3% of applications that exceeded 30 days, or the 0.05% that exceeded 60 days, do not represent Minneapolis' "standard operating procedure" and usual practice. Nor do the 4.7% of applications exceeding 30 days or the approximately 13 total applications (or 0.37%) exceeding 60 days in Saint Paul, especially given the unique event impacting processing time from July to September 2025, represent Saint Paul's "standard operating procedure" and usual practice.

Indeed, both Cities' respective standard operating procedures are well within what courts have found constitutional. As explained above, the "law is plain as can be that some amount of time for background checks is permissible." *McRorey*, 99 F.4th at 839–40. While courts have correctly refused to set a bright-line rule on exactly how much time is

permissible,[15] several decisions provide guidance. Start with *Bruen*. There, the Supreme Court blessed background checks but refused to rule out constitutional challenges to licensing schemes "put toward abusive ends" by, for example, "requiring lengthy wait times" that effectively "deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9. Applying this standard, the Fifth Circuit and the Second Circuit have upheld statutory background-check periods that could last up to, respectively, 10 business days[16] and 30 calendar days. *McRorey,* 99 F.4th at 839–40; *Giambalvo*, 155 F.4th at 184. Similarly, the Fourth Circuit, in rejecting a facial challenge to a statute that allowed up to 30 days, suggested that processing applications within "15 days" or "two weeks" passed constitutional muster. *See Maryland Shall Issue, Inc.*, 116 F.4th at 227 & n.15. And the Second Circuit in *Giambalvo* refused to hold that processing delays exceeding 30 days were *per se* violations of the Second Amendment, but expressed concern about delays of up to two or three years. 155 F.4th at 184.

Minneapolis' processing times are well within these bounds. Data regarding Minneapolis' processing time of Section 624.7131 applications that were received from August 1, 2023 to September 30, 2026, have been provided to the Court. Gangnon Decl. ¶ 22–24 , Ex. A. As shown in the table below, these data show the overwhelming majority of applications in Minneapolis are processed within the 10 business days approved by *McRorey*. Indeed, Minneapolis' processing times average 9.19 calendar days or, if the first quarter of

---

[15] As the background checks for the two Minneapolis applications that exceeded 60 days show, some checks present unusual and legitimate challenges. Gangnon Decl. ¶¶ 25h-i. Imposing a *per se* rule would arbitrarily disregard occasional challenges in correctly identifying those individuals who may be constitutionally prohibited from owning firearms under decisions such as *Rahimi*.

[16] Ten business days equals 12-18 calendar days depending on weekends and holidays.

2026 is excluded,[17] 7.71 calendar days. The majority of applications are processed in 8 calendar days or less. And nearly *all* applications are processed within 21 calendar days.

*Fig. 1. Section 624.7131 Applications and Processing Time in Minneapolis*[18]

| | **2023** 09/23 – 12/23 | **2024** All | **2025** All | **2026** Q1 | **2026** Q2 | **2026** Q3 | **Overall** w/o Q1 2026 | **Overall** All |
|---|---|---|---|---|---|---|---|---|
| *Total Apps.* | 470 | 1343 | 1251 | 703 | 258 | 203 | 3526 | 4229 |
| *Average (Days)* | 6.98 | 8.81 | 6.91 | 16.60 | 8.12 | 6.47 | 7.71 | 9.19 |
| *Median (Days)* | 7 | 8 | 7 | 16 | 8 | 6 | 7 | 8 |
| *Mode (Days)* | 6 | 7 | 7 | 21 | 10 | 2 | 7 | 7 |
| *% ≤ 7 Days* | 60.2% | 47.3% | 63.1% | 0.0% | 46.1% | 61.6% | 55.3% | 46.1% |
| *% ≤ 10 Days* | 80.0% | 68.6% | 90.2% | 13.1% | 74.0% | 89.7% | 79.4% | 68.4% |
| *% ≤ 14 Days* | 94.7% | 83.6% | 96.6% | 40.7% | 95.7% | 93.6% | 91.2% | 82.8% |
| *% ≤ 21 Days* | 100% | 97.4% | 99.1% | 84.6% | 98.1% | 99.0% | 98.5% | 96.2% |
| *% ≤ 28 Days* | 100% | 99.7% | 99.7% | 98.9% | 99.6% | 99.5% | 99.7% | 99.6% |
| *% ≤ 30 Days* | 100% | 99.9% | 99.8% | 99.0% | 99.6% | 100% | 99.8% | 99.7% |

As these data show, Plaintiff will not be able to submit evidence showing that Minneapolis has a pattern or practice of violating the Second Amendment. Minneapolis is entitled to summary judgment.

Saint Paul's processing times are likewise well within constitutional bounds. Casanova Decl. Ex. A, B. As these data show, Plaintiff will not be able to submit evidence showing that

[17] In the first quarter of 2026, at a time when law enforcement resources were particularly strained due to the United States's decision to pursue "Operation Metro Surge," in the Twin Cities, Minneapolis experienced an unprecedented and unexpected surge in permit applications. Gagnon Decl. ¶ 25a. This caused a temporary increase in processing times, skewing Minneapolis' overall average upward by approximately 1.5 days.

[18] *See* Brey Decl. ¶¶ 7–11 (including and explaining table).

Saint Paul has a pattern or practice of violating the Second Amendment. Saint Paul, too, is entitled to summary judgment.

## CONCLUSION

The Complaint should be dismissed because the United States lacks standing as to Section 624.7132 and because the Complaint fails to satisfy the federal pleading standard; in the alternative, the Cities are entitled to summary judgment on the relevant factual record.

Dated: November 10, 2026

MINNEAPOLIS CITY ATTORNEY'S OFFICE
Kristyn Anderson, City Attorney

By/s/ *Antonia Konkoly*
ANTONIA KONKOLY (0504377)
HEATHER ROBERTSON (0390470)
MICHAEL A. BREY (398620)
Assistant City Attorneys
350 South Fifth Street
Minneapolis, MN 55415
(612) 673-2548
(612) 299-2742
(612) 673-2020
toni.konkoly@minneapolismn.gov
heather.robertson@minneapolismn.gov
michael.brey@minneapolismn.gov

*Attorneys for Defendant City of Minneapolis*

IRENE KAO
Saint Paul City Attorney

*/s/ Aaron Winter*
AARON WINTER (0390914)
ALEXANDER HSU (0399275)
*Assistant City Attorneys*
750 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, MN 55102
(651) 266-8781
(651) 266-8769
aaron.winter@ci.stpaul.mn.us
alexander.hsu@ci.stpaul.mn.us

*Attorneys for Defendant City of Saint Paul*